OPINION OF THE COURT
Barbara R. Kapnick, J.
The instant proceeding was commenced by notice of petition and a verified petition, both dated June 15, 2009, seeking an order and judgment pursuant to CPLR article 78:[1]
1. Declaring null and void and annulling the New York State Insurance Department (the NYID) letter’s approvals of (a) the $1.147 billion dividend paid by MBIA Insurance Corporation (MBIA Insurance or MBIA Corp.) to MBIA Inc., (b) the $938 million transfer of cash and securities from MBIA Insurance to MBIA Inc., (c) the transfer of all National Public Finance Guarantee Corporation (formerly known as MBIA Insurance Corp. of Illinois) (MBIA Illinois or MuniCo) common stock from *182 MBIA Insurance to MBIA Inc., and (d) the reinsurance agreement between MBIA Insurance and MBIA Illinois;
2. Ordering that MBIA Inc. immediately pay all unlawfully paid dividends (approximately $2,085 billion in cash and securities, and all the common stock of MBIA Illinois) into a constructive trust for the benefit of all MBIA Insurance creditors, including petitioners. Alternatively, ordering the Superintendent to direct MBIA Inc. and/or the MBIA Insurance directors who voted in favor of such unlawful dividends to restore the dividends to MBIA Insurance and, if necessary, to sue MBIA Inc. and/or such directors to recover such dividends on behalf of the creditors of MBIA Insurance;
3. Declaring that the NYID letter does not extinguish petitioners’ causes of action against MBIA Inc., MBIA Insurance, and MBIA Illinois, in the action commenced by petitioners on May 13, 2009 in this court, captioned ABN AMRO Bank N.V. v MBIA Inc. (index No. 601475/09);[2] and
4. Awarding petitioners their attorneys’ fees and costs in connection with this proceeding.
The parties to this article 78 proceeding provided the court with a voluminous record that included legal memoranda, several of which are over 100 pages in length, factual and expert affidavits and deposition testimony, commencing with the petition dated June 15, 2009 and continuing even after petitioners submitted their sur-surreply papers on or about March 16, 2012. The nearly three years of briefing culminated in the court hearing extensive oral argument on May 14, 15, 17, 18, 21, 22, 24, 29, 31 and June 1, 4, 5, and 7, 2012. Additional post-hearing submissions were made by the parties for sometime thereafter.
I. Background
Petitioner Bank of America, N.A. is a bank organized under the laws of the United States. Petitioner Société Générale is a banking corporation organized under the laws of the Republic of France, acting through its New York branch. Petitioners hold insurance policies with MBIA Insurance, whereby MBIA Insurance guaranteed (directly or indirectly) the repayment of structured-finance products. (Verified petition lili 25, 32.)
*183 Respondent Eric R. Dinallo was the Superintendent of the NYID during the relevant time period and is named as a respondent in his former official capacity. (Verified petition U 35.)
Respondent NYID was an agency of the State of New York during the relevant time period. On October 3, 2011, the newly enacted Financial Services Law took effect, pursuant to which the New York State Insurance Department and the New York State Banking Department were consolidated into the New York State Department of Financial Services, an agency headed by the Superintendent of Financial Services. (See L 2011, ch 62.)
Respondent MBIA Inc. is a Connecticut corporation, with its principal place of business in Armonk, New York. Respondent MBIA Insurance Corporation, also known as MBIA Corp., is a New York domiciled insurance corporation with its principal place of business in Armonk, New York. It is a wholly owned and controlled subsidiary of MBIA Inc. and was regulated by the NYID during the relevant time period. (Verified petition 1ÍH 37-38.)
Respondent National Public Finance Guarantee Corporation is an Illinois domiciled insurance corporation with its principal place of business in Armonk, New York. Until June 5, 2009, National Public Finance Guarantee Corporation was known as MBIA Insurance Corp. of Illinois, which was a wholly owned and controlled subsidiary of MBIA Insurance. It is now a wholly owned and controlled subsidiary of another entity, which is a wholly owned and controlled subsidiary of MBIA Inc. (Verified petition 11 39.)
According to former Superintendent Dinallo,
“16. FGIs [Financial Guaranty Insurers] originated in the 1970s as ‘monoline’ insurers, so called because they wrote one line of business - insurance of municipal bonds (debt offerings by states, municipalities and other public entities), many of which are used to finance infrastructure and other public projects. Some insurers of municipal bonds purchased highly-rated insurance of their obligations in order to enhance the credit rating of their underlying bonds, thereby increasing the marketability of those bonds and reducing the cost to the public entities that issued them. The marketplace and credit rating agencies generally have perceived municipal debt as low-risk, since municipalities and other public entities historically have had extremely low *184 default rates. But the existence of insurance on such debt (and thus, additional capital behind the municipality’s obligations) provided additional confidence to municipal bond investors, and thus increased liquidity in the municipal bond market by drawing in more investors, including pension funds and other large institutional investors.
“17. In the 1980s, FGIs (including MBIA Corp.) began to insure, in addition to municipal bond obligations, payment obligations under asset-backed securities CABS’), including residential mortgage-backed securities (‘RMBS’) and commercial mortgage-backed securities COMBS’). During the 2000s, as the market for ABS expanded rapidly, FGIs’ exposure as insurers of ABS, collateralized debt obligations (‘CDOs’) backed by pools of ABS (‘ABS CDO’), and so-called ‘CDO-squareds’ (CDOs backed by pools of ABS CDOs), increased dramatically.
“18. Beginning in late 2007, the global financial system experienced a crisis that posed significant issues and challenges for some segments of the insurance industry, including the FGIs that had insured structured finance products such as RMBS, CMBS, ABS CDOs, and CDO-squareds. By the end of 2007, many FGIs faced significant losses, leading to sharp declines in the market prices of their stock, and eventually lost their AAA credit ratings. Many of the FGIs were compelled to increase their loss reserve levels and/or to cease writing new insurance business including insurance of both municipal products and structured finance products.” (Dinallo affirmation, Nov. 21, 2011, lili 16-18.)
Beginning in late 2007, the NYID met with representatives from the principal FGIs to discuss their financial condition, including their projected losses from structured finance exposure, and directed each of these FGIs to provide the NYID with frequent updates as to their ongoing financial condition. (Dinallo affirmation 111119-21.) According to Dinallo, after receiving input from FGIs, financial institutions, private equity investors, potential reinsurers, rating agencies and federal regulators, he learned that “FGIs’ ability to provide significant value to bond insurers hinged on their ability to maintain a AAA rating from the major credit rating agencies, and that without AAA credit rating an FGI could not remain viable as a provider of municipal bond insurance.” {Id. 1111 22-23.)
*185 On January 22, 2008, the NYID issued a news release, which announced its three-part plan regarding bond insurance companies:
“1. Attract more capital and increase capacity to protect policyholders and ensure continued availability of bond insurance, especially for municipal issuers. Specifically, the Department successfully invited Berkshire Hathaway to open a new bond insurance company in New York and quickly approved a capital-raising plan for MBIA. The Department is currently in discussions with other parties about possible future capital investments.
“2. Facilitate solutions to current market challenges. The Department is engaged with insurers, banks, financial advisors, credit rating agencies, other regulators and government officials, and other stakeholders in examining and developing measures to help stabilize the market.
“3. Develop stronger regulation for bond insurance. Since it is clearly time to develop new rules for the road, the Department is drafting new regulations that would redefine the future activities of bond insurers. The Department welcomes any input on this project.
“As a regulator, our primary responsibility is to protect policyholders and safeguard the solvency of insurance companies so they can pay any claims. Additionally, we work to ensure that consumers, businesses and governments have access to the insurance products they need from a healthy, competitive market. Our activities in the bond insurance market are aimed at achieving those goals . . . .”
In early 2008, the NYID retained Perella Weinberg Partners L.P and the law firm of Fried, Frank, Harris, Shriver & Jacobson LLP to provide advice on FGI industry issues. (Dinallo affirmation 1Í1Í 24, 27.) While working with its outside consultants, the NYID reviewed and analyzed the financial conditions and potential exposures of each FGI under its jurisdiction and came to the understanding that not every FGI was in a similar financial position or equally capable of helping to address the market liquidity concerns presented by the financial crisis. (Id. ¶ 31.)
Also in early 2008, the NYID was considering various ways in which MBIA Corp. could further strengthen its capital position. (Id. ¶ 35.) Then in February 2008,
*186 “William Ackman of Pershing Square Capital Managment HP, an investor who long had been publicly bearish on MBIA’s future business prospects, proposed a hypothetical restructuring for MBIA Corp. that would have split its book between municipal bond insurance policies and structured finance policies. Mr. Ackman’s proposal entailed leaving the structured finance policies with MBIA Corp. and creating a wholly-owned subsidiary , of MBIA Corp. for the municipal bond insurance policies. In the same month, MBIA executives proposed to the Department a different hypothetical restructuring of MBIA Corp. that would have split its book, in which the newly-created insurer for the municipal bond policies would have been a direct subsidiary of MBIA Inc., and thus an affiliate of MBIA Corp. rather than its wholly-owned subsidiary.” (Id. ¶ 36.)
According to Dinallo, the “Department was not favorably disposed toward either of these proposals in early 2008 because [they] did not believe they would advance the interests of any MBIA Corp. policyholders” and because they “would have jeopardized MBIA Corp.’s AAA rating.” (Id. ¶ 37.)
Then, in the spring of 2008, “MBIA Corp.’s circumstances changed significantly. On June 5, 2008, S & P downgraded MBIA Corp.’s credit rating two notches, from AAA to AA, based on its structured finance policy exposures. On June 19, 2008, Moody’s downgraded MBIA Corp.’s credit rating five notches from Aaa to A2.” (Id. ¶ 39.)
According to Dinallo,
“[d]uring the fall of 2008, after MBIA Corp.’s credit rating had been downgraded, the Department and its outside consultants discussed with MBIA executives a potential restructuring of MBIA Corp. These discussions focused on the objective of creating an entity that could achieve a AAA rating, write new municipal bond insurance business, and attract capital investment (both private and public), thereby strengthening the overall financial condition of the holding company system for the ultimate benefit of all policyholders.” (Id. ¶ 42.)
On December 5, 2008, MBIA Corp. and its related subsidiaries and affiliates (collectively, the MBIA entities) requested approval of transactions under articles 13, 14, 15, 41, 69 and 71 of the New York State Insurance Law (the application) (as *187 supplemented and/or amended on Dec. 23, 2008, Feb. 3, 4, 5, 10, 11, 13 and 16,- 2009).
By the application, the MBIA entities sought the following:
1. Approval, pursuant to Insurance Law § 4105 (a), for MBIA Corp. to declare and distribute to MBIA Inc. a dividend (the dividend) in the amount of $1.147 billion in cash and securities.
2. Approval for MBIA Corp., pursuant to Insurance Law § 1411 (d), to redeem from MBIA Inc., its sole shareholder, 32,064 shares of MBIA Corp. capital stock in exchange for approximately $938 million in cash and securities and all of the issued and outstanding shares of MBIA Illinois or Munico, MBIA Corp.’s wholly-owned subsidiary, pursuant to a plan to redeem and retire shares of MBIA Corp.’s stock (the stock redemption).
3. Approval, pursuant to Insurance Law §§ 1505 (d) and 1308 (e), for MBIA Corp. to enter into a reinsurance transaction (the reinsurance transaction) with MuniCo. The reinsurance transaction would be effectuated through the execution of a number of agreements between MBIA Corp. and MuniCo, including, inter alia, a reinsurance agreement (the MBIA reinsurance agreement).
4. Confirmation, pursuant to Insurance Law § 6906 (a), that MBIA Corp. will receive full financial credit for the reinsurance provided by the MBIA reinsurance agreement, including the ability to release all unearned premium, contingency, and other reserves applicable to the policies covered by the terms of the MBIA insurance agreement.
5. Non-objection, pursuant to Insurance Law § 6904 (e), to MuniCo’s and MBIA Corp.’s proposed plans to reduce their respective exposures to loss to no more than permitted amounts under Insurance Law § 6904 (c) and (d).
6. Approval, pursuant to Insurance Law § 1505 (d), for MBIA Corp. to enter into a master services agreement with MuniCo.
7. Determination, pursuant to Insurance Law § 7105, that, in the aggregate, the series of transactions contemplated does not constitute a transfer of all or substantially all of the assets of MBIA Corp.
Upon receiving the application, Dinallo called upon NYID staff, including senior lawyers within the NYID’s Office of General Counsel, and outside consultants and counsel to assist in the application’s review. (Dinallo affirmation 1HI 46-47.) In addition, because MBIA Corp. had submitted extensive statements of financial condition in support of its application, which were *188 based in part on loss modeling, Dinallo also called upon Jack Buchmiller, who at the time was the supervising risk management specialist in the NYID’s Capital Markets Bureau. (Id. ¶¶ 48, 51.)
According to Dinallo, he delegated to Buchmiller, under the supervision of Deputy Superintendents Hampton Finer, Michael Moriarty and Matti Peltonen, Chief of the Capital Markets Bureau, the responsibility of determining the scope of his review, with the understanding that his principal focus should be on whether MBIA Corp. would have sufficient claims-paying resources to pay all of its claims as they came due post-transformation. (Id. ¶¶ 51-52.) Buchmiller, who is currently a capital markets program manager with the Capital Markets Bureau of the National Association of Insurance Commissioners (NAIC), was given this assignment because he was the NYID’s most experienced and knowledgeable employee with respect to structured finance products and had substantial experience in creating, analyzing and comparing financial models and projections. (Dinallo affirmation 1i1i 51, 53; Buchmiller supp aff, Dec. 21, 2011, HIT 2, 12.)
In a letter dated February 17, 2009, signed by Michael Moriarty, the Deputy Superintendent for Property and Capital Markets, the NYID approved various components of the application (the approval letter). The approval letter describes the contemplated transactions, in relevant part, as follows:
“A. The Dividend and Stock Redemption
“The series of transactions described in the Application (the ‘Transformation’) are designed to recapitalize MuniCo. In order to do so, MBIA Corp. will transfer cash and securities from its surplus to MBIA Inc., that will, in turn, be contributed to MuniCo. “Pursuant to the Stock Redemption, MBIA Corp. will redeem and retire 32,064 shares of its stock that are owned by MBIA Inc. in exchange for approximately $938 million in cash and securities and all of the shares of MuniCo owned by MBIA Corp. (which constitute all of the outstanding shares of MuniCo). As a result of the Stock Redemption, MuniCo will cease to be a direct subsidiary of MBIA Corp. and will become a direct, wholly-owned subsidiary of MuniCo Holdings (as defined below). Pursuant to the MBIA Corp. Dividend, MBIA Corp. will declare and pay to MBIA Inc. a dividend in the *189 amount of approximately $1.147 billion in cash and securities. Thus, MBIA Corp. proposes to transfer, in the aggregate, approximately $2.27 billion in cash, securities and the shares of MuniCo stock, to MBIA Inc. pursuant to the MBIA Corp. Dividend and Stock Redemption.
“MBIA Inc. will contribute the approximately $2.27 billion, which includes the shares of MuniCo stock, it receives from MBIA Corp. to MuniCo Holdings, Inc. (‘Munico Holdings’), the intermediate holding company incorporated under the laws of the State of Delaware and wholly-owned by MBIA Inc. MuniCo Holdings will become the sole owner of MuniCo. MuniCo Holdings will retain 100% of the shares of MuniCo capital stock transferred to it, and will contribute $2.085 billion in cash and securities to MuniCo.
“After the Stock Redemption, MBIA Corp. will retire and cancel the redeemed shares and increase the par value of the remaining 67,936 shares of common stock of MBIA Corp. from $150.00 to $220.80, through a charter amendment, in order to maintain MBIA Corp.’s capital at an amount equal to or greater than $15 million. The charter amendment has been submitted under separate cover to the Superintendent for review and approval pursuant to Insurance Law § 1206 (a).
“B. The Reinsurance Transactions “Once MuniCo is recapitalized as described above, MuniCo and MBIA Corp. will enter into a number of transactions pursuant to which MuniCo will reinsure, on a cut-through basis, those financial guaranty insurance policies sold or reinsured by MBIA Corp. that insure securities issued by U.S. public entities (‘Public Finance’).”
In approving the transformation, the approval letter stated the following, in relevant part:
“The Department’s Property Bureau, together with its colleagues in the Department, has considered the requests set forth in the Application and its accompanying submissions. In most instances the documents accompanying the Application were unexecuted agreements. The Department has made the following determinations upon the basis that the fully executed documents will be identical in all *190 material respects to the unexecuted versions provided to the Department as of the close of business on February 13, 2009. In consideration of the foregoing, the Department issues the following approvals:
“A. The MBIA Corp. Dividend
“Insurance Law § 4105 (a) prevents an insurer, within a 12 month period, from paying dividends to shareholders in excess of ten-percent of surplus to policyholders. That statute grants the Superintendent the discretion to permit an insurer to exceed such limitation upon a finding that the insurer will retain sufficient surplus to support its obligations and writings. Pursuant to the foregoing and based upon (1) the representations contained in the Application and its supporting submissions, and in reliance on the truth of those representations and submissions, (2) the Department’s examination of the MBIA Entities’ financial condition prior to the Transformation, and (3) the Department’s analysis of the MBIA Entities’ financial condition after the effectuation of the Transformation, the Department finds that MBIA Corp. will retain sufficient surplus to support its obligations and writings following the payment of the MBIA Corp. Dividend. Thus, the Department approves the MBIA Corp. Dividend under Insurance Law § 4105 (a).
“B. The Stock Redemption
“Insurance Law § 1411 (d) permits an insurer to repurchase its own capital shares pursuant to a plan of stock redemption and retirement that the Superintendent finds to be reasonable and equitable. Pursuant to the foregoing and based upon (1) the representations contained in the Application and its supporting submissions, and in reliance on the truth of those representations and submissions, (2) the Department’s examination of the MBIA Entities’ financial condition prior to the Transformation, and (3) the Department’s analysis of the MBIA Entities’ financial condition after the effectuation of the Transformation, the Department finds that the Stock Redemption is reasonable and equitable to MBIA Corp. Thus, the Department approves the Stock Redemption under Insurance Law § 1411 (d).
*191 “C. The MBIA Reinsurance Transaction
“1. Insurance Law §§ 1308 and 6906
“Insurance Law § 1308 (e) provides that an insurer may not, without the Superintendent’s permission, pay premiums on reinsurance in excess of 50% of unearned premiums on the net amount of insurance in force during any consecutive twelve-month period. Insurance Law § 6906 states that a financial guaranty insurer may purchase reinsurance from another licensed financial guaranty insurer (like MuniCo). Insurance Law § 6906 (a) further provides, in relevant part, that the reinsurance purchased by a financial guaranty insurer must be subject to an agreement that, for its stated term, the reinsurance agreement may only be terminated or amended (i) at the option of the reinsurer or the ceding insurer, if the reinsurance agreement provides that the liability of the reinsurer with respect to policies in effect at the date of termination shall continue until the expiration or cancellation of each such policy, or (ii) with the consent of the ceding company, if the reinsurance agreement provides for a cutoff of the reinsurance in force at the date of termination.
“Based upon (1) the requirements of Insurance Law §§ 1308 and 6906, (2) the representations made in the Application and its supporting submissions, and in reliance on the truth of those representations and submissions, (3) the Department’s examination of the MBIA Entities’ financial condition prior to the Reinsurance Transaction, (4) the Department’s analysis of the MBIA Entities’ financial condition after the consummation of the Reinsurance Transaction, and (5) the Department’s expertise and knowledge about insurance companies, the business of insurance and reinsurance, and the market for reinsurance, the Department approves the Reinsurance Transaction pursuant to Insurance Law § 1308.
“2. Article 15
“Insurance Law § 1505 (a) sets forth the standard for approval of transactions within a holding company system to which a controlled insurer is a party. Insurance Law § 1505 (a) provides, in relevant part, that for each such transaction:
“a. The terms shall be fair and equitable;
“b. Charges or fees for services performed shall be reasonable; and
*192 “c. Expenses incurred and payments received shall be allocated to the insurer on an equitable basis. “Insurance Law § 1505 (d) provides that the parties may enter into the proposed holding company system transaction if the Superintendent does not disapprove the transaction after applying the factors set forth in Insurance Law § 1505 (a) and considering whether the transaction may adversely affect the interests of policyholders.
“Based upon (1) the factors set forth in Insurance Law §§ 1505 (a) and 1505 (d), (2) the representations made in the Application and its supporting submissions, and in reliance on the truth of those representations and submissions, (3) the Department’s examination of the MBIA Entities’ financial condition prior to the Reinsurance Transaction, (4) the Department’s analysis of the MBIA Entities’ financial condition after the consummation of the Reinsurance Transaction, and (5) the Department’s expertise and knowledge about insurance companies, the business of insurance and reinsurance, and the market for reinsurance, the Department does not disapprove of the Reinsurance Transaction pursuant to Insurance Law § 1505 (d).”
On February 18, 2009, the NYID issued a news release, which stated the following in relevant part:
“The New York State Insurance Department has facilitated and supervised a transformation of MBIA Insurance Corporation (MBIA Corp.) that effectively splits that company in two, dividing its assets and liabilities between two highly capitalized insurance companies, Superintendent Eric Dinallo announced today. Of the resulting companies, MBIA Corp. will focus on the international and structured finance market, while the second company, National Public Finance Guarantee Corporation (National), will cover only public finance policies, such as those on municipal bonds.
“ ‘This deal is fair to all policyholders — the bank counterparties and other policyholders of the structured financings and the owners and issuers of municipal bonds,’ Dinallo said. ‘It should aid the municipal bond market in two ways. First, it will stabilize and hopefully increase the ratings and therefore the value of $537 billion in outstanding *193 municipal bonds .... Second, at a time when we want to increase spending on infrastructure as part of the stimulus plan, some municipalities and public authorities who need to raise money for building bridges or schools, housing or hospitals, have had to pay more to issue bonds, leaving less to spend on building, or put off development because they were unable to borrow.
“ ‘Municipalities and authorities have been searching for bond insurance in a marketplace where only one insurer is currently active. With the return of a solidly capitalized insurer with more than 30 years of experience, we hope this will help reinvigorate the municipal bond market and help public entities get easier, less costly access to credit. This transformation opens the way to attracting both private and public capital to this market. That is why we at the New York Insurance Department along with Director Michael T. McRaith and his dedicated staff at the Illinois Division of Insurance worked closely and diligently to effectuate this successful outcome.’
“ ‘As the public sector and private enterprise struggle with the dual needs for capital and financial certainty, the severance of the MBIA enterprise into two distinct operations will deliver both. Assuring counter-party certainty should introduce some measure of much-needed confidence and stability. At the same time, municipalities and other public finance agencies will benefit from the enhanced capital position of MBIA Illinois. We believe this outcome will support national and local economic stimulus plans and the infrastructure improvements that will bring jobs to communities around the country.’ . . . “National is currently domiciled in Illinois and called MBIA Insurance Corporation of Illinois (MBIA Illinois). It will be renamed and plans to re-domesticate to New York during the second quarter of 2009. It will not have any exposure to structured finance nor any international exposure. Both MBIA Illinois and MBIA Corp. are member companies of MBIA, Inc.
“Both MBIA Corp. and National will continue to pay all valid claims in a timely fashion, and both entities will have sufficient resources to meet policyholder claims as they come due. Consistent *194 with New York State Insurance Law, the New York State Insurance Department only approved the transaction after deciding that both companies would have sufficient statutory capital to meet the letter and spirit of the Insurance Law. The review and study process lasted approximately one year. “MBIA Corp. will have $10.1 billion in claims paying resources to cover structured finance business with net par outstanding of $240 billion, and will retain the risk of the non-public finance policies including credit default swaps. It is expected to garner an investment grade rating.
“National will receive a cash infusion of approximately $5 billion from MBIA Corp. Of this, $2.89 billion in premiums will be used to reinsure $537 billion in municipal bonds. That includes all bonds currently insured by MBIA Corp., as well as those bonds originally insured by the Financial Guaranty Insurance Company and currently reinsured by MBIA Corp. All policyholders will be able to make claims for payment directly to the municipal bond-only insurer in accordance with the applicable agreements.
“MBIA Corp. will provide the remaining $2.09 billion to National as capital. National intends to manage for a high, stable rating, and plans to raise sufficient third-party capital to be capitalized in excess of historical AAA levels. Following this capital infusion, National will be in a position to insure new municipal bond issues and help thaw the frozen municipal credit markets . . . .”
II. Applicable Standard of Review
CPLR 7803 provides in relevant part as follows:
“The only questions that may be raised in a proceeding under this article are:
“1. whether the body or officer failed to perform a duty enjoined upon it by law; or
“2. whether the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction; or
“3. whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of *195 discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed; or
“4. whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence.”
CPLR article 78 “was adopted for the purpose of achieving procedural, not substantive, reform in the law of prerogative writs.” (Vincent C. Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C7803:l.) CPLR 7803 (1) corresponds to the writ of mandamus to compel; CPLR 7803 (2) corresponds to the writ of prohibition; and CPLR 7803 (4) corresponds to the writ of certiorari. (Id.) CPLR 7803 (3), which is at issue in this proceeding, corresponds to the writ of mandamus or mandamus to review. (Id.)
“Mandamus to review is the category of judicial review of agency determinations that are ‘administrative,’ as opposed to judicial or quasi-judicial, in nature. Administrative determinations may properly be made without a trial-type hearing and may be based on ‘whatever evidence is at hand,’ regardless of whether it appears in the record of a hearing.” (Id., quoting Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77 NY2d 753, 757-758 [1991].)
“In a proceeding in the nature of mandamus to review, ... a court examines an administrative action involving the exercise of discretion.” (Scherbyn, 77 NY2d at 757.)
As stated above, CPLR 7803 (3) provides several grounds for challenging an agency determination. At issue here are three of the four available grounds: (1) whether the determination was affected by an error of law, (2) whether it was arbitrary and capricious, or (3) whether it was an abuse of discretion. (Tr at 135:19-136:9, May 15, 2012; petitioners’ slide 185.)[3]
A. Affected by an Error of Law
According to Professor Alexander, “Courts seldom single out ‘error of law,’ by name, as the question for consideration in an *196 Article 78 proceeding. This question is often implicit, however, in the nature of the grievance, such as an allegation that the agency improperly interpreted or applied a statute or regulation.” (Vincent C. Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C7803:l.)
In this context, “the construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld.” (Matter of Howard v Wyman, 28 NY2d 434, 438 [1971], rearg denied 29 NY2d 749 [1971].) Moreover, “in questions relating to its expertise, the [agency’s] interpretation of the statute’s terms must be ‘given great weight and judicial deference, so long as the interpretation is neither irrational, unreasonable nor inconsistent with the governing statute.’ ” (Matter of Toys “R” Us v Silva, 89 NY2d 411, 418-419 [1996] [citations omitted].)
“By contrast, where the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency ... In such circumstances, the judiciary need not accord any deference to the agency’s determination, and is free to ascertain the proper interpretation from the statutory language and legislative intent.” (Matter of Belmonte v Snashall, 2 NY3d 560, 566 [2004] [citations and internal quotation marks omitted].)
B. Arbitrary and Capricious
“The arbitrary or capricious test chiefly ‘relates to whether a particular action should have been taken or is justified . . . and whether the administrative action is without foundation in fact.’ Arbitrary action is without sound basis in reason and is generally taken without regard to the facts . . . ‘[T]he proper test is whether there is a rational basis for the administrative orders . . . .’ ” (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974] [citations omitted].)
“It is the settled rule that judicial review of an administrative determination is limited to the grounds invoked by the agency. We have said that ‘ “[a] reviewing court, in dealing with a determination . . . which an administrative agency alone is *197 authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.” ’ ” (Matter of Scherbyn, 77 NY2d at 758 [citations omitted].)
Moreover, a “fundamental tenet of CPLR article 78 review” is that “[jjudicial review of administrative determinations is confined to the ‘facts and record adduced before the agency.’ ” (Matter of Featherstone v Franco, 95 NY2d 550, 554 [2000], citing Matter of Yarbough v Franco, 95 NY2d 342, 347 [2000]; see also Matter of Fanelli v New York City Conciliation & Appeals Bd., 90 AD2d 756, 757 [1st Dept 1982], affd 58 NY2d 952 [1983].) In other words, “the court may not consider evidence concerning events that took place after the agency made its determination” (Matter of Rizzo v New York State Div. of Hous. & Community Renewal, 6 NY3d 104, 110 [2005]), and “can only review the grounds presented by the agency at the time of its determination.” (Matter of Weill v New York City Dept. of Educ., 61 AD3d 407, 408 [1st Dept 2009].)
During oral argument, the state respondents referred to a recent case decided by the Appellate Division, Third Department, Matter of Office Bldg. Assoc., LLC v Empire Zone Designation Bd. (95 AD3d 1402 [2012]), in which the Court held that where, as here, no administrative hearing was held, the Court may properly consider an affidavit “despite the fact that it was not submitted during the administrative process.” (Id. at 1405.) However, the Court also found that the affidavit could not be used to “supply the rationale otherwise missing from the Board’s [or Department’s] determination.” (Id.; see also Matter of Brown v Sawyer, 85 AD3d 1614, 1615-1616 [4th Dept 2011] [holding that a court may properly consider an affidavit submitted in opposition to an article 78 petition despite the fact that it was not submitted during the administrative process, because there was no administrative hearing, and thus the issue was not one of substantial evidence, but rather whether the agency’s determination has a rational basis]; Matter of Kirmayer v New York State Dept. of Civ. Serv., 24 AD3d 850, 852 [3d Dept 2005].)
C. Abuse of Discretion
“ ‘Abuse of discretion,’ another of the specified grounds for review under CPLR 7803(3), arguably is superfluous [since it] . . . (is encompassed by *198 [the] arbitrary and capricious test). Historically, abuse of discretion was not included as an independent ground of review in the original version of Article 78 of the Civil Practice Act. If a court overturned an agency’s exercise of discretion, the agency was said to have acted arbitrarily and capriciously or unreasonably.” (Vincent C. Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C7803:l.)
“Aside from consideration of administrative sanctions, however, most courts continue to analyze abuses of discretion in traditional terms of whether the agency’s action was arbitrary and capricious or lacked a rational basis.” (Id., citing Matter of Older v Board of Educ., Union Free School Dist. No. 1, Town of Mamaroneck, 27 NY2d 333 [1971].) It is important to note, however, that when reviewing an agency’s exercise of discretion “a court may not substitute its judgment for that of the board or body it reviews unless the decision under review is arbitrary and unreasonable and constitutes an abuse of discretion.” (Matter of Pell, 34 NY2d at 232 [citation and internal quotation marks omitted].)
III. Application
A. Affected by an Error of Law
At the outset, the court notes that it is well settled that “[responsibility for administering the Insurance Law rests with the Superintendent of [Financial Services], who has ‘broad power to interpret, clarify, and implement the legislative policy.’ ” (Matter of Medical Socy. of State of N.Y. v Serio, 100 NY2d 854, 863-864 [2003] [citations omitted]; see also Financial Services Law §§ 201, 202; Insurance Law §§ 301, former 201.)
Petitioners generally argue that each of the three transformation transactions was illegal under the Insurance Law because (1) the dividend was declared and distributed in excess of its “earned surplus”; (2) the stock redemption had no legitimate business purpose other than as a disguised illegal dividend to MBIA Inc.; and (3) the reinsurance transaction between MBIA Illinois and MBIA Insurance was on inherently unfair terms because it was funded by the illegal dividend and stock redemption. Petitioners also contend that the transactions were not “fair and equitable,” under section 1505 of the Insurance Law.
1. The MBIA Corp. Dividend and the MBIA Reinsurance Transaction
Insurance Law § 4105 governs payment of dividends and provides in relevant part as follows:
*199 “§ 4105. Domestic stock companies; declaration and payment of dividends
“(a) Except as provided in subsection (c) of this section no domestic stock property/casualty insurance company shall declare or distribute any dividend to shareholders except out of earned surplus. Notwithstanding the foregoing, the superintendent may permit a domestic stock property/casualty insurance company to restate its earned surplus under a plan of quasi-reorganization in accordance with regulations as may be promulgated by the superintendent. No domestic stock property/casualty insurance company shall declare or distribute any dividend to shareholders which, together with all dividends declared or distributed by it during the next preceding twelve months, exceeds the lesser of ten percent of its surplus to policyholders as shown by its last statement on file with the superintendent, or one hundred percent of adjusted net investment income during such period unless, upon prior application therefor, the superintendent approves a greater dividend distribution based upon his finding that the insurer will retain sufficient surplus to support its obligations and writings.
“In this section, (1) ‘earned surplus’ means the portion of the surplus that represents the net earnings, gains or profits, after deduction of all losses, that have not been distributed to the shareholders as dividends, or transferred to stated capital or capital surplus or applied to other purposes permitted by law but does not include unrealized appreciation of assets;
“(2) ‘adjusted net investment income’ means net investment income for the twelve months immediately preceding the declaration or distribution of the current dividend increased by the excess, if any, of net investment income over dividends declared or distributed during the period commencing thirty-six months prior to the declaration or distribution of the current dividend and ending twelve months prior thereto; and
“(3) ‘surplus’ means the amount of the insurer’s admitted assets in excess of its capital and liabilities, and both ‘surplus’ and ‘surplus to policyholders’ include any voluntary reserves, or any part thereof, *200 which are not required by law.”
Insurance Law §§ 1308, 1505 and 6906 govern reinsurance transactions. Section 1505, which is at issue here, provides in relevant part as follows:
“§ 1505. Transactions within a holding company system affecting controlled insurers.
“(a) Transactions within a holding company system to which a controlled insurer is a party shall be subject to the following:
“(1) the terms shall be fair and equitable;
“(2) charges or fees for services performed shall be reasonable; and
“(3) expenses incurred and payments received shall be allocated to the insurer on an equitable basis in conformity with customary insurance accounting practices consistently applied. . . .
“(d) The following transactions between a domestic controlled insurer and any person in its holding company system may not be entered into unless the insurer has notified the superintendent in writing of its intention to enter into any such transaction at least thirty days prior thereto, or such shorter period as he may permit, and he has not disapproved it within such period: . . .
“(2) reinsurance treaties or agreements; . . .
“(e) The superintendent, in reviewing transactions pursuant to subsections (c) and (d) hereof, shall consider whether they comply with the standards set forth in subsections (a) and (b) hereof and whether they may adversely affect the interests of policyholders.”
Petitioners argue that under Insurance Law § 4105 “a company must comply with financial dividend restrictions when declaring and paying a dividend,” meaning that “the term ‘out of earned surplus’ in § 4105 (a) requires that an insurer have sufficient ‘earned surplus’ when the dividend is both ‘declared’ and ‘distributed.’ ” (Petitioners’ reply brief at 114.) Here, petitioners contend that MBIA Insurance did not have sufficient earned surplus either when it declared or when it distributed the $1,147 billion dividend. Petitioners maintain that as of September 30, 2008, it is undisputed that the earned surplus of MBIA Insurance was approximately $189 million, which is far-less than the $1,147 billion dividend declared by the MBIA In *201 sur anee Board of Directors on December 16, 2008. (Id. at 115.) Furthermore, petitioners contend that as of December 31, 2008, it is undisputed that MBIA Insurance’s earned surplus was $1 million. (Id.) Thus, petitioners argue that MBIA Insurance violated section 4105 (a) by distributing, on February 17, 2009, the $1.147 billion dividend to MBIA Inc.
To rebut this, the state respondents first assert that the NYID complied with Insurance Law § 4105 (a) by finding “that MBIA Corp. will retain sufficient surplus to support its obligations and writings following payment of the MBIA Corp. Dividend.”[4] (Approval letter at 6; see also State’s surreply brief at 49.) Both the state respondents and the MBIA respondents further argue that the transformation transactions occurred simultaneously, and as a result:
“the Reinsurance Transaction removed approximately $3.48 billion in policy liabilities from the balance sheet of MBIA Insurance, and reserves to support these liabilities were transferred to the reinsurer, MBIA Illinois. The release of these liabilities and the payment of a ceding commission to MBIA Insurance from MBIA Illinois resulted in a substantial increase in MBIA Insurance’s earned surplus. Thus, the Transformation itself — through the Reinsurance Transaction — released sufficient earned surplus for MBIA Insurance to declare and distribute the Dividend.” (MBIA surreply brief at 17-18 [citations omitted]; see also State’s surreply *202 brief at 49-50.)
Furthermore, the MBIA respondents point out that the dividend was not declared or distributed on December 16, 2008; rather, the Board of Directors only provided contingent approval on that date, “subject to receipt of any applicable regulatory approvals.” (Record at R00631; see also MBIA surreply brief at 15.) Therefore, the MBIA respondents contend that there is no basis to measure earned surplus as of December 2008; instead, they claim, it should be measured as of the date it was paid— February 18, 2009. (MBIA surreply brief at 15.)
Petitioners, however, argue that the alleged illegal dividend cannot be salvaged by claiming that the reinsurance transaction and the dividend were simultaneous. (Petitioners’ reply brief at 116.) First of all, petitioners contend that the transactions did not occur simultaneously — citing the approval letter and respondents’ affidavits, which describe the transformation as a “series of transactions,” which they argue means that the transactions occurred sequentially, not simultaneously. (Id. at 116-117; see also petitioners’ sur-surreply brief at 84.) Next, they argue that assuming arguendo that the transactions did happen simultaneously, MBIA Insurance still lacked the necessary earned surplus prior to the declaration of the dividend on December 16, 2008 and the distribution of the dividend on February 17, 2009. (Petitioners’ reply brief at 116.) Petitioners point out that the approval letter fails to mention either “earned surplus” or the theory that the reinsurance transaction would create the earned surplus used to fund the dividend. (Id. at 117; see also petitioners’ sur-surreply brief at 83.) Petitioners also argue that the simultaneity theory “violates the letter and spirit of section 4105 and eviscerates the earned surplus requirement.” (Petitioners’ reply brief at 117.)
As to whether or not the transformation transactions occurred simultaneously, the MBIA respondents point out that transformation was a “package deal,” whereby MBIA Insurance presented the transactions to the NYID in one application and they were all approved at the same time. Indeed, the MBIA respondents point to Mr. Moriarity’s testimony in which he stated that “[t]he transactions, as far as I know, were not performed in any specific order but were done simultaneously as part of the transformation application.” (Moriarty deposition 93:17-94:02.)
The court is aware that a specific finding regarding Insurance Law § 4105 (a)’s earned surplus test is absent from the approval letter. However, the court disagrees that this omission alone *203 mandates it to find that the agency’s determination was “affected by an error of law.” This is especially true where, as here, the agency was not required to make specific findings because it was not acting in a quasi-judicial capacity. The court also cannot ignore the fact that, despite the approval letter’s silence as to the earned surplus test, the parties here have extensively briefed and argued the issue of whether or not the transformation transactions were simultaneous and whether the dividend and reinsurance transactions actually satisfied the earned surplus test. The court thus concludes that it must resolve these issues.
In his affirmation, Dinallo states the following:
“In particular, I would not have approved the dividend or stock redemption components of the Transformation in the absence of the reinsurance agreement component, and vice versa. The letter that the Department issued on February 17, 2009 approving the Transformation discusses each component of the Transformation seriatim and, in particular, discusses the dividend and stock redemption components before it discusses the reinsurance agreement component. However, the discussion of the components in this way was merely for ease of public understanding. The components of the Transformation were considered, and approved, as both simultaneous and interdependent parts of a single proposed transaction.” (Dinallo affirmation 1Í 72.)
Moreover, it is clear from the application itself that MBIA proposed and intended for the transactions to happen simultaneously. MBIA submitted only one application, which describes and asks for the Superintendent’s approval of all of the transformation transactions, none of which occurred prior to February 17, 2009, when the NYID issued the approval letter. Additionally, in exhibit B to the application, MBIA stated that the closing of the stock redemption “shall be simultaneous with the closing of the transactions contemplated by Transformation! ]....” (Exhibit B to the application; record at R00054.) Therefore, there can be no dispute that the simultaneity of the transformation transactions was contemplated from the start, and as a result, petitioners’ arguments to the contrary are without merit.
To satisfy Insurance Law § 4105, however, the simultaneous transactions still must have created enough earned surplus to effect the dividend. The MBIA respondents point to the deposition testimony of Richard H. Hershman who was retained by *204 petitioners’ counsel as an expert witness and later deposed by-counsel for the MBIA respondents. Hershman testified with respect to the issue of simultaneity and earned surplus, in relevant part, as follows:
“Q: Okay. All right. Turning your attention to Paragraph 117 — well, actually 119. For the record it reads, ‘Without the reinsurance transaction occurring first, the dividend could not have been declared or distributed as its’ — ‘as its size exceeded MBIA Corp.’s earned surplus by over one billion.’ Is that your opinion?
“A: Yes.
“Q: Okay. Well, what if — what if you assumed that the reinsurance transaction had occurred first. Would — would there have been sufficient earned surplus to effect the dividend . . .
“A: Assuming — what you’re saying, assuming facts that are not in this case, the reinsurance occurred first. Hypothetically?
“Q: Uh-huh.
“A: I guess if — if the requirements to effect a reinsurance transaction would have been met, and then you would look at it at that stage and see if there was enough — you know, enough surplus to effect a dividend.
“Q: Well, do you dispute that the reinsurance transaction release — released sufficient earned surplus to issue the dividend? . . .
“A: Again, in the hypothetical, under the terms that I’ve seen in the reinsurance transaction, I don’t disagree that it released enough earned surplus.
“Q: Okay. Turning your attention to Paragraph 123, looking at the last sentence of Paragraph 123, which I’ll read for the record, ‘Only after all of these transactions had occurred would National have had adequate surplus to assume the Public Finance business under the reinsurance.’ Is that your opinion?
“A. Yes
“Q. All right. So — so assuming that all the transactions occurred simultaneously, did National have adequate surplus to assume the Public Finance business under the reinsurance?
“MR. SHAPIRO: Objection to form. Mischaracterizes the report.
*205 “MR. WELCH: I’m not characterizing the report.
“A. Again, I think I’ve — I—I testified to this already. But assuming — you’re saying assuming that there was — it was in the approval letter that these transactions should be accounted for at [sic] simultaneous, which it’s not in the approval letter, then under those circumstances would somebody be able to effect these transactions in a way that it could get this desired result? The answer could be yes.” (Hershman deposition, Apr. 17, 2012, 320:13-322:23 [emphasis added].)
There is nothing in Insurance Law §§ 4105, 1308 or 1505 that bars payment of a dividend out of earned surplus created by a simultaneous transaction. Nor is the court aware of any provision in the Insurance Law which sets out any procedural requirements that must be followed to effectuate these types of transactions. As such, this court will not read into the Insurance Law such requirements or disturb the actions of the Superintendent, which were made in his discretion and were not affected by an error of law.
Petitioners also argue that the reinsurance transaction was not “fair and equitable” in accordance with Insurance Law § 1505. Petitioners urge that the NYID failed to properly review the reinsurance transaction in light of the entire transformation, and only reviewed it individually. (Petitioners’ reply brief at 128-129.)
In his affidavit, dated November 24, 2009, Moriarty stated the following, in relevant part:
“63. Pursuant to Insurance Law § 1505, the terms and conditions of the Reinsurance Transaction were fair and equitable because they were based upon a comparable market precedent that was approved by the Department, specifically, the FGIC Reinsurance Transaction [ ]. The FGIC Reinsurance Transaction was an arms-length deal between unaffiliated parties, which resulted from an auction process directed by the Department. Many bidders participated, enabling FGIC to select the best offer and negotiate the final terms, which were similar to those in the instant Reinsurance Transaction. In the Reinsurance Transaction, the unearned premium paid by the municipal policyholders, minus a ceding commission to MBIA Corp., was in line with the FGIC Reinsurance Transaction, which makes such an *206 agreement fair and equitable. In addition, bulk reinsurance transactions such as the one represented by the MBIA Reinsurance Agreement are contemplated by Insurance Law § 1308 and are routinely considered by the Department. The Department’s approval of the MBIA Reinsurance Agreement stems from the Department’s extensive experience in reviewing bulk reinsurance transactions, particularly those involving FGIC and CIFG, which are described above . . .
“64. Pursuant to Insurance Law § 1505, the Department also determined that the Reinsurance Transaction would not have an adverse impact on any of the policyholders of the MBIA Entities. The Department concluded that following the Transformation the public finance policyholders would benefit because National Public Finance would provide direct reinsurance — via the MBIA Reinsurance Agreement and the Second-to-Pay Policies — for MBIA Corp.’s public finance policies.
“65. The Department determined that the Reinsurance Transaction also would be beneficial to all holders of structured finance policies and would be in the best interests of these policyholders, given the fact that MBIA Corp. would realize a statutory gain as a result of the ceding commission. Following the Transformation, MBIA Corp. would retain surplus to policyholders in the amount of $3,086 billion and claims paying resources in the amount of approximately $9,246 billion, which includes the receipt of a ceding commission from National Public Finance of $765 million. MBIA Corp. demonstrated to the Department that these resources will be more than adequate to pay all expected and potential claims as they come due.” (Moriarty aff 1Í1Í 63-65.)
Moreover, the approval letter itself makes clear that the NYID considered the relevant provisions of the Insurance Law in making its decision to not object to the reinsurance transaction. (See supra at 15-17.) The state respondents argue that the Superintendent followed the plain language of section 1505 and specifically adhered to the requirement in section 1505 (e) to consider whether the reinsurance transaction may adversely affect the interests of policyholders. (State respondents’ surreply brief at 44-45.) Specifically, Dinallo found that the transaction was “fair and equitable” because it “would leave MBIA Corp. solvent and *207 that those policyholders’ claims would be paid as they came due.” (Dinallo affirmation H 66.) Therefore, this court finds that the NYID’s interpretation of section 1505 was not “irrational or unreasonable” and “should be upheld.” (Matter of Howard, 28 NY2d at 438.)
2. The Stock Redemption
According to the approval letter, the portion of the transformation referred to as the “stock redemption” allowed MBIA Corp. to redeem and retire 32,064 shares of its stock that were owned by MBIA Inc. in exchange for approximately $938 million in cash and securities and all of the shares of MuniCo owned by MBIA Corp. The “stock redemption” was reviewed under section 1411 of the Insurance Law, which provides, in relevant part, as follows:
“§ 1411. Authorization of, and restrictions on, investments . . .
“(d) No domestic stock insurer shall purchase its own capital shares except pursuant to section seven thousand three hundred two of this chapter or pursuant to a plan of stock redemption and retirement approved by the superintendent as reasonable and equitable. No domestic insurer shall enter into any agreement in connection with the sale of any property to repurchase such property or any part thereof, except that such an insurer may (subject to the provisions of subsection (b) of this section) sell securities subject to an unconditional obligation to repurchase the same on a date not more than one year from the date of sale. This subsection shall not apply to the purchase or sale of directors’ qualifying shares.”
Petitioners first argue that MBIA’s “stock redemption” was a “poorly disguised illegal dividend” that involved the exact same economic principles as a dividend, and, therefore, should have been subject to review under Insurance Law § 4105 (a)’s earned surplus test.
To support this contention, petitioners rely on People v Santi (3 NY3d 234 [2004]), which involved the appeal of a conviction of one of the defendants for the unauthorized practice of medicine. The Santi Court undertook a review of Education Law § 6512 (1), which criminalizes the unauthorized practice of medicine, and provides as follows:
“Anyone not authorized to practice under this title *208 who practices or offers to practice or holds himself out as being able to practice in any profession in which a license is a prerequisite to the practice of the acts, or who practices any profession as an exempt person during the time when his professional license is suspended, revoked or annulled, or who aids or abets an unlicensed person to practice a profession, or who fraudulently sells, files, furnishes, obtains, or who attempts fraudulently to sell, file, furnish or obtain any diploma, license, record or permit purporting to authorize the practice of a profession, shall be guilty of a class E felony.” (Emphasis added.)
One of the defendants, Corines, who was a licensed physician, was convicted of aiding and abetting an unlicensed person to practice medicine. On appeal, he argued that his conviction could not be upheld because the plain language of Education Law § 6512 (1) makes clear that it only applied to “anyone not authorized to practice,” which did not include him. The Court held that although courts “normally accord statutes their plain meaning,” they would not “blindly apply the words of a statute to arrive at an unreasonable or absurd result” and would “examine the purpose of the statute and determine the intention of the Legislature.” (Id. at 242-243.) The Court concluded that although Corines’ interpretation of the statute represented a “fair and literal reading of the text,” it ignored “the legislative intent underlying the statute’s enactment” and would make it lawful for authorized and licensed practitioners to aid and abet in the unlicensed and unauthorized practice of a profession, requiring the statute to be applied in an unreasonable manner. (Id. at 243.) As a result, the Court rejected Corines’ argument.
Here, petitioners reason that it would be an “unreasonable or absurd application of the law” to interpret Insurance Law § 1411 (d) to permit stock repurchases that are not restricted by Insurance Law § 4105 (a)’s earned surplus test, and urge this court, as did the Santi Court, to look to the legislative intent when applying Insurance Law § 1411 (d). (Petitioners’ reply brief at 120.) The difference, however, between the instant case and the facts presented in Santi is that in the latter, the Court of Appeals concluded that Corines’ argument was based on a “fair and literal reading of the text,” while here there is nothing in the text of Insurance Law § 1411 (d) to support the argument that stock redemptions are subject to the provisions of Insurance Law § 4105 (a). Even if this court were to look to the *209 legislative intent which petitioners cite, i.e., that the legislature wanted the Superintendent to have to approve stock redemptions to prevent possible self-dealing by management and insiders (see petitioners’ reply brief at 120), this intention is not at odds with the plain language of Insurance Law § 1411 (d), which clearly states that “a plan of stock redemption and retirement [must be] approved by the superintendent as reasonable and equitable.” If the legislature wanted to incorporate any portions of Insurance Law § 4105 (a) into section 1411 (d), it certainly could have done so, but instead chose not to. Therefore, this court will not impose the standards set out in Insurance Law § 4105 (a) on Insurance Law § 1411 (d).
Next, petitioners argue that “under settled New York law, transactions having the economic substance of dividends are treated as dividends regardless of how those transactions are formally structured.” (Petitioners’ reply brief at 121.) However, petitioners fail to cite any authority to support this statement. Instead, petitioners cite Small v Sullivan (245 NY 343 [1927]), which was a plenary action sounding in fraud and involved review of the Business Corporation Law. Petitioners quote the following passage to support their argument: “Compliance with forms of law does not amount to absolution for fraud. All of these corporation statutes have their legitimate purposes, but they cannot be used as a blind to pay dividends when there are no actual profits out of which to pay them.” (Id. at 354.) This notion, however, has no bearing on the issue before this court, which is whether the Superintendent or the NYID improperly interpreted or applied a statute or regulation in making its decision. There is no basis to find that the NYID committed an error of law when it failed to treat the proposed stock redemption as a proposed dividend.
Petitioners also argue that even if the transaction was properly examined solely under Insurance Law § 1411 (d), the NYID still erred in finding that it was “reasonable and equitable,” because “the Stock Redemption removed assets from MBIA Insurance to enrich its parent and affiliate, and to discriminatorily benefit one class of policyholders at the expense of another.” (Petitioners’ reply brief at 125.) Petitioners also contend that the Superintendent was in no position to make a determination as to whether the stock redemption was “reasonable and equitable” because the stock was valued according to MBIA Insurance’s own accounting book value, not what an arm’s length purchaser would offer for the stock. (Id. 125-126.)
*210 The state respondents, on the other hand, argue that nothing in the Insurance Law defines “reasonable and equitable,” or provides criteria for the Superintendent to use when evaluating whether a particular share redemption is “reasonable and equitable.” (State’s surreply brief at 47.) Here, Superintendent Dinallo decided that the stock redemption was “reasonable and equitable” as long as MBIA Corp. would be able to pay its claims as they became due following transformation. (Id.) According to Dinallo, he concluded, based on the Department’s analysis of MBIA Corp.’s post-transformation financial condition, that MBIA Corp. would “retain sufficient surplus to retain its obligations and writings” and, therefore, it would be able to pay claims as they became due. (Dinallo affirmation 1Í 72.) Accordingly, because Insurance Law § 1411 (d) leaves the determination of whether a share redemption is “reasonable and equitable” to the Superintendent’s discretion, the state respondents contend that Dinallo did not violate or otherwise misapply Insurance Law § 1411 (d) by approving the share redemption.
The court agrees that the term “reasonable and equitable,” as it applies under Insurance Law § 1411 (d), is undefined. As such, the court finds that in interpreting the meaning of “reasonable and equitable,” it must “defer to the governmental agency charged with the responsibility for administration of the statute.” (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980].) Here, the Department determined that a stock redemption would be “reasonable and equitable” as long as the insurer would be able to pay claims as they came due after the redemption. The court cannot say that this interpretation is “irrational or unreasonable” (id.), or that, as petitioners urge, the Superintendent had an obligation under the Insurance Law to consider a third-party stock valuation. Therefore, the court does not find that the stock redemption was affected by an error of law.
B. Arbitrary and Capricious/Abuse of Discretion
Petitioners argue that the approval letter must be annulled because it contains no findings of fact to demonstrate the basis for its conclusion. In making this assertion, petitioners principally rely on Matter of Montauk Improvement v Proccacino (41 NY2d 913 [1977]), which employs the “substantial evidence” test, which is the “exclusive standard for the review of an agency’s fact-finding determination in an Article 78 proceeding in the nature of certiorari.” (Vincent C. Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C7803:3.) However, it has already been established that CPLR *211 7803 (4) is not at issue here because an administrative hearing was never held, nor was one required under the Insurance Law. (ABN AMRO Bank, N.V. v MBIA Inc., 17 NY3d 208, 227 [2011].) Therefore, petitioners’ reliance on Montauk Improvement, or any other cases brought pursuant to CPLR 7803 (4), is misplaced.[5]
In both their sur-surreply brief and during oral argument, petitioners argued that because administrative action, if taken without foundation in fact, is arbitrary and capricious as a matter of law, the approval letter here must be annulled because it rests on false and misleading information. (Petitioners’ sursurreply brief at 14; see also tr at 438:12-440:4, May 18, 2012.) Petitioners contend that this “false and misleading information” concerns MBIA Insurance’s financial condition and impacts the results of MBIA’s stress testing analysis. Specifically, petitioners argue that MBIA relied on stale financial data when running its models because it used financial information from the third quarter of 2008 and never updated the models with information from the fourth quarter. (Tr at 1317:8-22, May 31, 2012.) Petitioners urge that with the corrected numbers, the “extreme-stress” scenario would have shown a negative surplus, meaning that MBIA Insurance would have been “insolvent” under Buchmiller’s and the NYID’s analysis. (Petitioners’ sur-surreply brief at 15-17.)
MBIA admits that the application contained errors and describes them, in relevant part, as follows:
“MBIA and its experts have identified a number of errors in certain of the materials in the record MBIA submitted to the NYID .... The corrected materi *212 als demonstrate that, while MBIA Insurance’s projected policyholder surplus and statutory capital would have been lower in the base, stress and extreme stress scenarios that were provided to the NYID, MBIA Insurance still was solvent and maintained assets sufficient to pay all policyholder claims as they came due. Although correcting certain issues in the extreme stress scenario decreased policyholder surplus to negative $291 million, MBIA Insurance still maintained more than $1.3 billion in contingency reserves, which provided MBIA Insurance with positive statutory capital of approximately $1 billion. That MBIA Insurance’s policyholder surplus projected to be negative for a limited amount of time in the extreme stress scenario is immaterial as well. The extreme stress scenario was specifically created for the NYID as a ‘break-the-bank’ analysis to which ‘no probability’ was associated, not as an actual measure of MBIA Insurance’s post-Transformation claims-paying ability. Nor does the extreme stress scenario take into account certain capital adjustments, such as other reserves, deferred tax assets, and potential put-back claims, all of which would make MBIA Insurance’s surplus positive if included in the analysis.” (MBIA surreply brief at 34 n 32; Chaplin surreply aff 1i 3.)
During oral argument on May 18, 2012, petitioners handed up a case appendix entitled, “Courts Have Long Held that Article 78 Petitions Should be Granted When an Agency Acts on Inaccurate or Incomplete Information.” After reviewing the appendix, the court finds that none of the 14 cases cited provide a basis for this court to annul the approval letter.
For example, in Matter of Brady v City of New York (22 NY2d 601 [1968]), while the Court held that agencies such as the pension board “must make a careful and painstaking assessment of all the available evidence and should defer final determinations until they are satisfied that all the evidence has been fully and fairly considered,” it did so because the pension board had a statutorily imposed duty “to determine from all the available evidence whether the death in question was sustained as the result of an accident while the decedent was in the performance of his duties.” (Id. at 605-606.) This court is not aware of a similar statutory duty in the Insurance Law that would have *213 required the NYID to consider “all available evidence” before deciding whether or not to approve the transformation.[6]
The instant factual pattern is also unlike the one that was before the Appellate Division, First Department in Matter of Byrne v Board of Stds. & Appeals of City of N.Y. (5 AD3d 261 [2004]). In Byrne, the Appellate Division affirmed the motion court’s granting of an article 78 petition, and annulling the resolution of the Board of Standards and Appeals (the BSA), which had upheld the determination of the Department of Buildings (DOB) declining to seek revocation of a certificate of occupancy (C/O), where the owner had failed to substantially comply with numerous safety, fire, and habitability standards. The motion court found that the DOB was without authority to issue a C/O under those circumstances, and thus that the C/O was void. The Appellate Division held that “no judicial deference is owed to an agency’s statutory interpretation that is premised on an erroneous factual conclusion.” (Id. at 265.) The Court further reasoned that
“to sanction such a policy would provide an incentive for unscrupulous owners ‘to file whatever papers are necessary to obtain a certificate of occupancy, regardless of their accuracy, secure in the knowledge that so long as the renovations required are possible to do, the owner will be able to retain the certificate of occupancy, and all its attendant benefits, even if he has never performed the renovations promised.’ ” (Id. at 267.)
Petitioners highlighted this passage perhaps to suggest that this court should annul the approval letter because to do otherwise would essentially be sanctioning a policy of allowing insurers to submit false information to the NYID. However, as the state respondents pointed out, the Appellate Division dis *214 agreed with the motion court’s suggestion that the BSA would have to revoke a C/O “for any violation of the approved plans or applicable laws, no matter how inconsequential.” (Id. at 267 n 3.) Moreover, it is clear that the NYID had a practice of “relying on and presuming the accuracy of the materials submitted” because “prior Superintendents had exercised their discretion in that way, in reliance on the Department’s authority to take punitive action against any regulated entity that willfully provided false or misleading information.” (Dinallo affirmation 1Í 48; see also Insurance Law § 109.) It is also clear from the September 2, 2010 deposition of Michael Moriarty that the Department had a policy regarding how it reviews the accuracy of the applications it receives:
“Q: Do you know whether anybody from the Insurance Department made any effort to verify the accuracy of MBIA Insurance’s financial [condition] in connection with its review of the Transformation application? . . .
“A: The Department did not, nor do they usually verify the financial condition of a company upon an application for a dividend or for a stock redemption or for a reinsurance agreement.
“Q: In fact, the Insurance Department doesn’t take steps to determine whether the financials are accurate of an insurance company, right? It relies on the auditors. . . .
“Q: Outside auditors.
“A: The Insurance Department relies upon its own examinations, which it does every three to five years by law. It relies to a certain extent on the independent certified public accountant’s report which is required to be filed on an annual basis. It relies upon the actuarial opinion which must be submitted on an annual basis. It takes into account the history of the company with the Department in assessing whether financial information — the risk of financial information is being misstated. And again, the representations and the swearing to of each financial statement by the chief officer of the insurance company.” (Moriarty deposition at 287:6-288:16.)
It is, therefore, not for this court to disturb NYID practices absent a violation of law or regulation; nor is it this court’s role to promulgate new NYID policies or procedures.
Moreover, the cases cited by petitioners do not stand for the broad proposition that all agency determinations must be an *215 nulled if based on inaccurate information, regardless of what that information is or what role it played in the decision making process. There is a difference between the instant situation where the NYID may have used incorrect numbers in hypothetical “extreme stress” tests and a parole board having the wrong information about the number and types of crimes an inmate was convicted of when considering his or her parole application, because in the latter scenario there is an obvious “likelihood that such error may have affected the board’s decision to deny parole . . . .” (Matter of Brazill v New York State Bd. of Parole, 76 AD2d 864, 864 [2d Dept 1980]; see also Matter of Williams v Travis, 20 AD3d 622 [3d Dept 2005]; Matter of Schwartz v Dennison, 14 Misc 3d 1220[A], 2006 NY Slip Op 52543[U] [Sup Ct, NY County 2006].) Here, however, petitioners have not shown that there is a likelihood that the admitted errors in the numbers used in a hypothetical “extreme (break-the-bank) stress” test scenario would have affected the NYID’s decision.
The court also notes that petitioners put forth arguments regarding allegations that MBIA concealed certain information from the NYID, including, but not limited to, a 2008 analysis of MBIA’s multi-sector CDO portfolio, prepared by Lehman Brothers. (Petitioners’ sur-surreply brief at 29-43.) Aside from quoting the Honorable James A. Yates, who presided over this case before he resigned from the bench in January 2011, and stated on the record during a conference on May 18, 2010 that “if there is material misleading of the Department, I think it would be relevant to the Article 78,” petitioners fail to provide any legal authority to support their argument that this court can annul the Department’s decision based on claims that MBIA concealed or withheld potentially damaging information from the NYID.
Petitioners next argue that the NYID’s review of the application and Buchmiller’s review, in particular, was too limited, was rushed and was based on errors. (See petitioners’ sur-surreply brief at 53-59.) In their sur-surreply brief, petitioners also draw particular attention to the uncertain and volatile economic climate that existed at the time of the review and argue that Dinallo’s response to this uncertainty was not rational because a rational regulator would have deliberated more carefully. (Petitioners’ sur-surreply brief at 50-52.)
The state respondents take issue with petitioners’ characterization of the NYID’s review and point out that the NYID received and reviewed thousands of pages of documents along *216 with the application, including the draft agreements for each of the proposed transactions, supplemental information from MBIA requested by the NYID, including supplemental information regarding the terms of the reinsurance agreement and related administrative services agreement between MBIA Corp. and National, pro forma balance sheets of MBIA Corp. reflecting year-end 2008 financial information, the opinion of Bridge Associates LLC concerning the solvency of MBIA, a fairness opinion from Raymond James Financial, Inc. and documents relating to MBIA Corp.’s loss models for its various exposures, including the inputs and assumptions for those models, and the results of the various stress scenarios. (State’s surreply brief at 63.)
The state respondents also argue that Buchmiller undertook an extensive, “risk focused” review of MBIA Corp.’s statements of financial condition and loss modeling methodologies to evaluate their analytical soundness, a review that included interviews and meetings with MBIA executives and a review of presentations, inputs and assumptions, outputs and other information relating to loss modeling. (State’s surreply brief at 64.) Additionally, the state respondents point out that, pursuant to Insurance Law § 309 (b) (1), the NYID routinely conducts solvency examinations of “every domestic property/casualty insurance company,” every three to five years, which can take from 12 to 18 months to complete. In this case, the NYID had begun a solvency exam of MBIA on or about September 25, 2008, which was also conducted, in part, by Buchmiller, along with a team of other NYID employees. (Tr at 640:7-645:7, May 21, 2012.)
As stated earlier, it is not for this court to oversee or to review the practices of the Superintendent or the NYID. The issue before this court is whether there was a rational basis for the approval of the transformation, or whether it was an arbitrary decision, taken without regard to facts. The inquiry is not whether the result would have been different had the NYID hired certain experts or conducted the review on a different time line or with different resources. Absent statutes or regulations that prescribe the manner in which the NYID must review the applications it receives, this court cannot say that it was arbitrary and capricious for the NYID not to have taken the course that petitioners insist, after the fact, would have been more prudent.
Petitioners also argue that the NYID failed to evaluate solvency under Insurance Law § 1309 and that the failure to make such a finding was arbitrary and capricious.
*217 Insurance Law § 1309 provides as follows:
“§ 1309. Insolvency of an insurer
“(a) Whenever the superintendent finds from a financial statement or report on examination that an authorized insurer is unable to pay its outstanding lawful obligations as they mature in the regular course of business, as shown by an excess of required reserves and other liabilities over admitted assets, or by its not having sufficient assets to reinsure all outstanding risks with other solvent authorized assuming insurers after paying all accrued claims owed, such insurer shall be deemed insolvent and the superintendent may proceed against it pursuant to the provisions of article seventy-four of this chapter.
“(b) If an insurer deemed insolvent pursuant to subsection (a) hereof is a foreign or alien insurer, the superintendent may also revoke or suspend its license to do business in this state.”
The MBIA respondents, on the other hand, argue that Insurance Law § 1309 does not apply here because that section empowers the Superintendent to take action against an insurer upon finding that the insurer is insolvent. (Tr at 1803:21-26, June 5, 2012.) MBIA and the state respondents contend that there was never a finding of insolvency here and, therefore, Insurance Law § 1309 is not implicated, because the approval letter expressly states, inter alia, that the NYID found that “MBIA Corp. will retain sufficient surplus to support its obligations and writings following payment of the MBIA Corp. dividend.”
Petitioners insist, however, that because the NYID only purports to have measured MBIA’s solvency by whether or not it would retain a sufficient surplus post-transformation and not by Insurance Law § 1309’s two-prong analysis (i.e., the loss reserve test or the reinsurance/market test), its approval of the transformation was arbitrary and capricious. (Tr at 302:12-306:26, May 17, 2012.)
The state respondents, on the other hand, argue that at the time of the review of the application, the “bond insurance market was essentially frozen,” and, therefore, a market based test was not an option because there was essentially no market. (Tr at 760:11-25, May 21, 2012.) The state respondents also point to Mr. Moriarty’s deposition testimony that in his experience the NYID has never relied on Insurance Law § 1309’s reinsurance *218 test and that it would have been inappropriate to do so during the financial crisis when no entities were willing to reinsure anything relating to mortgage backed securities. (Id. at 760:26-762:8; Moriarty deposition at 345:23-348:12.)
The court agrees with the MBIA and state respondents that Insurance Law § 1309 is not implicated here because the Superintendent never made a finding of insolvency.
IV Conclusion
Accordingly, for all the reasons stated herein, it is hereby adjudged that the relief sought in petitioners’ verified petition dated June 15, 2009 is denied, except that it is declared that the approval letter does not extinguish petitioners’ causes of action against MBIA Inc., MBIA Insurance and MBIA Illinois in the related plenary action commenced by petitioners on May 13, 2009, captioned ABN AMRO Bank N.V. v MBIA Inc., index No. 601475/09, in accordance with the decision of the Court of Appeals in ABN AMRO Bank, N.V. v MBIA Inc. (17 NY3d 208 [2011]).
The proceeding is hereby dismissed, without costs or disbursements to either party.

. The court notes that out of the 21 financial institutions that were initially petitioners in this case, only two remain, Bank of America, N.A. and Société Générale.

. This court need not address this issue since it has already been decided by the Court of Appeals in ABN AMRO Bank, N.V. v MBIA Inc. (17 NY3d 208 [2011]).

. The court notes at the outset, that after reviewing a voluminous number of article 78 cases spanning many years, including, but not limited to, those brought against the NYID, the court is not aware of any article 78 proceeding where the petitioners, who are seeking to overturn an agency’s decision, were not the original applicants or otherwise parties to the proceeding at the agency level.

. In his affirmation, Superintendent Dinallo states as follows:
“52. I repeatedly told Messrs. Buchmiller, Finer, and Moriarty that my paramount concern in considering MBIA Corp.’s application was, and hence the principal focus of the financial analysis should he, whether MBIA Corp. would have sufficient claims-paying resources following the Transformation to pay all of its claims as they came due. I tasked them to undertake a fair, dispassionate and unbiased review and analysis of the statements of financial condition and loss modeling presented by MBIA Corp. in its application.” (Dinallo affirmation If 52 [emphasis added].)
In addition, by order of this court on May 25, 2012, the state respondents produced an unredacted version of Buchmiller’s February 16, 2009, 59-page file memo, a partially redacted copy of which had been previously produced. The memo documents the work Buchmiller performed in connection with his transformation review, including Buchmiller’s analysis of MBIA Corp.’s construction and operation of its proprietary models and their loss modeling methodologies’ analytical soundness. (Buchmiller supp aff, Dec. 21, 2011, 1111 82, 13-14.) Buchmiller “concluded that MBIA Corp. would remain solvent following the Transformation, both in terms of having positive statutory capital and being able to pay its claims as they came due.” (Id. at 82.)

. By letter dated October 22, 2012, petitioners’ counsel submitted a copy of a decision in an article 78 proceeding entitled Matter of Harrison v MTA N.Y. City Tr. (37 Misc 3d 1209[A], 2012 NY Slip Op 51945[U] [Sup Ct, NY County, Sept. 27, 2012]), which they claim supports their positions that the NYID’s failure to explain its reasoning in writing when approving MBIA’s transformation requires annulment of that approval, and that the NYID’s attempt to retroactively explain its actions using post hoc affidavits from former NYID officials is wholly improper. Counsel for both MBIA and NYID submitted letters in response, and petitioners then submitted an additional letter in reply.
Harrison, however, is distinguishable from the instant proceeding, where a hearing was neither required nor held, since “[i]t is only where an administrative body or officer is acting in a quasi-judicial capacity that specific findings are required.” (Matter of Mid-Island Hosp. v Wyman, 25 AD2d 765, 767 [1st Dept 1966].)
As to petitioners’ second point, this is discussed, supra at 24-25.

. Petitioners also rely on Brady to argue that the NYID was arbitrary and capricious in not hiring third-party consultants, such as BlackRock, to analyze MBIA Insurance’s expected losses for CDOs and RMBS, because it had a “duty to engage in a ‘careful and painstaking assessment of all the available evidence.’ ” (Petitioners’ sur-surreply brief at 48.) Petitioners also contend that because NAIC guidelines, which they concede are not binding, call for the use of third-party experts to provide financial-modeling assistance, the NYID’s decision not to hire a third-party expert renders the approval arbitrary and capricious. Again, the court notes that it is unaware of any statute or binding regulation that imposed a duty upon the NYID to hire or consult third-party loss modeling experts before rendering a decision on the application. Absent such a duty, it cannot be said that failing to do so is grounds for annulling the approval letter.